IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

**DANNY DYKES, Individually and on**     **PLAINTIFF**
**behalf of the Estate and Wrongful Death**
**Beneficiaries of James A. Dykes, Deceased**

**V.**     **NO. 4:15-CV-00076-DMB-JMV**

**CLEVELAND NURSING &**
**REHABILITATION CENTER; and**
**JOHN AND JANE DOE I–X**     **DEFENDANTS**

## ORDER DENYING MOTION TO COMPEL ARBITRATION

This wrongful death action is before the Court on Defendant Cleveland Nursing & Rehabilitation Center's motion to compel arbitration. Doc. #4. For the reasons below, the motion to compel arbitration will be denied.

**I**
**Procedural History**

On April 20, 2015, Plaintiff Danny Dykes filed a complaint in the Circuit Court of Bolivar County, Mississippi, "individually and on behalf of the Estate and wrongful death beneficiaries of James A. Dykes, deceased." Doc. #2. In his complaint, Plaintiff alleges that James A. Dykes[1] died as a result of negligence while a patient at Defendant's nursing home facility. *Id*. at ¶¶ 7–8, 12.

On June 11, 2015, Defendant removed the state action to this Court on the grounds of diversity jurisdiction. Doc. #1 at ¶ 4. One week later, on June 18, 2015, Defendant filed a motion to compel arbitration. Doc. #4. Plaintiff responded within the time allowed, Doc. #8,

---

[1] The nature of the relationship between Plaintiff and James Dykes is not alleged in the complaint or apparent from the evidentiary record.

and Defendant filed a timely reply, Doc. #10. On July 10, 2015, Plaintiff filed a motion for leave to file a sur-rebuttal, Doc. #11, which this Court denied on August 4, 2015, Doc. #12.

## II
## Relevant Standard

The Federal Arbitration Act "permits an aggrieved party to file a motion to compel arbitration when an opposing party has failed, neglected, or refused to comply with an arbitration agreement." *Am. Bankers Ins. Co. of Fl. v. Inman*, 436 F.3d 490, 493 (5th Cir. 2005) (internal quotation marks omitted) (citing 9 U.S.C. § 4). "On a motion to compel arbitration by an aggrieved party, the Court shall decide the issue of arbitrability summarily." *Marsh v. First USA Bank, N.A.*, 103 F.Supp.2d 909, 914 (N.D. Tex. 2000) (citing 9 U.S.C. § 4). Thus, "evidence on the motion may be received by the Court." *Id*. Where the motion turns on resolution of evidentiary disputes, the required elements must be proven by a preponderance of the evidence by the party seeking to compel arbitration. *Grant v. Houser,* 469 F. App'x 310, 315 (5th Cir. 2012) (citing *Banks v. Mitsubishi Motors Credit of Am., Inc.*, 156 F. App'x 710, 712 (5th Cir. 2005)).

## III
## Factual Background

On November 12, 2012, Billy Dykes[2] and Defendant executed an "Appointment of Surrogate" form providing, under its "Section 2" heading, that "[t]his facility designates Billie [sic] Dykes as surrogate for James Dykes …." Doc. #10-1. Under a separate heading titled "Acceptance of Surrogate Selection," Billy[3] signed beneath the following clause: "I accept the appointment as surrogate for this Resident and understand I have the authority to make all health

---
[2] The nature of relationship between Plaintiff and Billy Dykes is not alleged in the complaint or apparent from the evidentiary record.

[3] To avoid confusion, the Court will refer to Billy Dykes and James Dykes by their first names.

2

care decisions for James Dykes, including the signing of an arbitration agreement for his/her admission to Cleveland Nursing + Rehab." *Id*. Of note, the form warned that, beyond the "Acceptance of Surrogate Selection," a proposed surrogate should "[c]omplete only Section 2 if Resident clearly lacks capacity." *Id*.

On the same day, Billy signed a "Resident and Facility Arbitration Agreement" ("Agreement") as "Family Member or other Representative." Doc. #8-1 at Ex. B. The Agreement, which was also signed by a representative of Defendant, provides in relevant part:

> **THIS AGREEMENT MUST BE SIGNED IN ORDER FOR THE RESIDENT TO RECEIVE SERVICES AT THE FACILITY ….**
>
> **2. Those Signing this Contract.** ... The parties agree that the signing of this Agreement, both by itself and in conjunction with the corresponding admission and receipt of services, is a health care decision …. **IF YOU DO NOT WISH TO SIGN THIS AGREEMENT, WE WILL ASSIST YOU IN FINDING PLACEMENT AT A DIFFERENT FACILITY** ….
>
> **3. Agreement to Submit Disputes to Binding Arbitration.** Any and all disputes between the Resident and the Facility shall be submitted to binding arbitration where the amount in controversy exceeds $25,000. This includes any disputes arising out of or in any way relating to this Agreement (its enforceability) the Admission Agreement, or any of the Resident's stays at the Facility, whether existing or arising in the future ….
>
> **5. Arbitration Procedure.** … It is the intention of the parties that this Agreement shall inure to the benefit of and bind the Facility, its affiliated entities, representatives, medical directors, employees, successors, assigns, and agents, and shall inure to the benefit of and bind the Resident, his/her successors, assigns, agents, attorneys, third party beneficiaries, insurers, heirs, trustees and representatives, including the personal representative or executor of the estate, the spouse, children, grandchildren, all decedents and next friends, and any person whose claim is derived through the Resident. This Agreement may be revoked within thirty (30) days after signing it by written notice sent certified mail … to the Facility's Administrator. If alleged acts underlying the dispute occur before the cancellation date, this Agreement shall be binding with respect to those alleged acts …. If the Resident cancels this Agreement, he or she will be allowed to receive services at the Facility pursuant to the terms and conditions of the underlying Admission Agreement.

*Id*. (emphasis in original). The parties represent that these documents were executed contemporaneously with James' admission to Defendant's facility, although no evidence has been submitted in that regard.

On December 29, 2012, approximately a month after James' admission, Dr. Charles Brock, James' primary physician, signed a "Physician Notification and Approval" stating that James lacked capacity "(1) to understand the significant benefits, risks, and alternatives to proposed health care and (2) … to make and communicate health care decisions." Doc. #10-2. Brock also opined that "[i]t is my opinion that this is true both on the day the surrogate accepted the appointment and today." *Id*.

## IV
## Analysis

"A two-step analysis is applied to determine whether a party may be compelled to arbitrate. First, [the court] ask[s] if the party agreed to arbitrate the dispute. If so, [the court] then ask[s] if any federal statute or policy renders the claims nonarbitratable." *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008) (internal citations and quotation marks omitted). Neither party has identified a federal statute or policy rendering the claims nonarbitratable. Accordingly, the only question before the Court is whether the parties agreed to arbitrate this dispute.

In order to determine whether parties agreed to arbitrate a dispute, the Court must answer two questions: "(1) is there a valid agreement to arbitrate the claims and (2) does the dispute in question fall within the scope of that arbitration agreement." *Sherer*, 548 F.3d at 381. Here, there is no dispute that the underlying action falls within the scope of the Agreement. Accordingly, the Court must only decide whether the Agreement represents a valid agreement to arbitrate the claims. *Id*. To this end, Plaintiff argues that the Agreement is invalid because: (1)

Billy did not have authority to bind James to the Agreement; and (2) the Agreement is unconscionable. Doc. #9 at 4–12.

### A. Billy's Authority to Bind James

"In determining whether an agreement to arbitrate exists, [courts] apply ordinary contract principles." *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003) (internal quotation marks omitted). Such principles, in turn, are derived from relevant state law. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally … should apply ordinary state-law principles that govern the formation of contracts."); *see also Cook v. GGNSC Ripley, LLC*, 786 F.Supp.2d 1166, 1169 (N.D. Miss. 2011) (citing *Kaplan*, 514 U.S. at 943). The parties represent, and this Court agrees, that Mississippi law governs interpretation of the Agreement.

Under Mississippi law, "[t]he elements of a contract are (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) *parties with legal capacity to make a contract*, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *GGNSC Batesville, LLC v. Johnson*, 109 So.3d 562, 565 (Miss. 2013) (emphasis in original). Where, as here, a signatory signs only as a representative, the fourth requirement compels an inquiry into whether the purported representative "had the ability to bind [the purported principal] to the contract." *Id*. In this regard, Defendant argues that Billy had authority to bind James to the Agreement because Billy was James' health-care surrogate. Doc. #5 at 3.

The law of health-care surrogates in Mississippi is governed by the Uniform Health-Care Decisions Act ("UHCDA"), Miss. Code Ann. §§ 41-41-201, et seq. *Covenant Health & Rehab*

*of Picayune, LP v. Lumpkin ex rel. Lumpkin*, 23 So.3d 1092, 1096 (Miss Ct. App. 2009). "[A] healthcare surrogate, acting under the provisions of the Uniform Health-Care Decisions Act, is capable of binding his or her patient to arbitration." *Id.* Under the UHCDA, in the absence of a surrogacy designation by the patient, "[a] surrogate may make a health-care decision for a patient who is an adult … if the patient has been determined by the primary physician to lack capacity and no agent or guardian has been appointed or the agent or guardian is not reasonably available." Miss. Code Ann. § 41-41-211(1) (West).

Plaintiff argues that Billy was not James' health-care surrogate at the time the Agreement was executed because: (1) at the time Billy signed the Agreement, James had not been determined by his primary physician to lack capacity; and (2) the signing of an arbitration agreement is not a "health-care decision" within the meaning of the statute. Doc. #9 at 2.

### 1. Health-Care Decision

Under the UHCDA, a health-care decision:

> means a decision made by an individual or the individual's agent, guardian, or surrogate, regarding the individual's health care, including: (i) Selection and discharge of health-care providers and institutions; (ii) Approval or disapproval of diagnostic tests, surgical procedures, programs of medication, and orders not to resuscitate; and (iii) Directions to provide, withhold or withdraw artificial nutrition and hydration and all other forms of health care.

Miss. Code. Ann. § 41-41-203 (West). The Mississippi Supreme Court has held that execution of an arbitration agreement is not a "health-care decision" within the meaning of the UHCDA, unless "the arbitration provision was an essential part of the consideration for the receipt of 'health care' …." *Miss. Care Ctr. of Greenville, LLC v. Hinyub*, 975 So.2d 211, 218 (Miss. 2008). This inquiry normally focuses on whether execution of the arbitration agreement "was … part of the consideration necessary for … admission to [the facility]." *Id.*; *see also Gross v. GGNSC Southaven, LLC*, 83 F.Supp.3d 691, 695 (N.D. Miss. 2015) ("[T]he [Mississippi]

6

Supreme Court has made it clear that health care surrogacies may only confer authority to sign a nursing home arbitration agreement on behalf of another when the agreement is a requirement of admission (and thus, conceptually, within the scope of health care decisions)."); *Covenant Health & Rehab. of Picayune, LP v. Estate of Moulds ex rel. Braddock*, 14 So.3d 695, 711 (Miss. 2009) (Graves, J., dissenting) ("[T]he rule after *Hinyub* is that the surrogate can bind the patient to arbitration only if the arbitration clause is a necessary, non-negotiable element of the entire admission contract.").

Notwithstanding the Agreement's plain and emphasized language that "**THIS AGREEMENT MUST BE SIGNED IN ORDER FOR THE RESIDENT TO RECEIVE SERVICES AT THE FACILITY**," Plaintiff argues that "[t]he express language of the arbitration provision … indicates that arbitration is not a precondition of admission to the Facility." Doc. #9 at 5. As support for this proposition, Plaintiff points to the Agreement's provision allowing for cancellation within thirty days of signing. *Id*. Defendant replies that "Plaintiff's passing reference that the Agreement could be canceled by the resident at a later date is immaterial, since all authority makes clear that Courts must focus on whether the Agreement was required for *admission* to the facility." Doc. #10 at 6 (emphasis in original).

The Court agrees with Defendant that *Hinyub* and related authority appear to focus on whether the signing of an arbitration agreement is a condition of *admission* to a particular facility, rather than a condition of later care. This focus makes sense given that the statutory definition of "health-care decision" specifically includes the "[*s*]*election* … of health-care providers and institutions." Miss. Code. Ann. § 41-41-203 (West) (emphasis added). Indeed, when execution of an arbitration agreement is a requirement for admission to a health-care institution, the decision to sign such an agreement necessarily relates to the selection of that

7

institution. It follows that, unless a cancellation provision allows for admission to a facility without signing an arbitration agreement, such provision has no bearing on whether the signing of the agreement is a health-care decision.

While the cancellation provision of the Agreement certainly weakens the Agreement's impact, its inclusion does not void the contract itself. *See Dismuke v. One Main Fin., Inc.*, No. 3:14-cv-947, 2015 WL 4429280, at *4 (S.D. Miss. July 20, 2015) ("Because OneMain's termination provision is armed with notice and it only applies prospectively, the Court cannot find that it is illusory. And even if it did not contain these factors, Mississippi law does not preclude such an agreement …."). Furthermore, there is nothing in the cancellation provision which alters the plain language of the Agreement that its execution was a precondition to admission to Defendant's facility. *See Ferrara v. Walters*, 919 So.2d 876, 882 (Miss. 2005) ("Our law requires this Court to accept the plain meaning of a contract as the intent of the parties where no ambiguity exists.") (collecting cases). Rather, the cancellation provision, which provides for a thirty-day cancellation window measured from the date of signature and continued treatment following cancellation, explicitly contemplates that the Agreement had been signed and the patient admitted to the facility. Accordingly, because the signing of the Agreement was an explicit requirement for admission to Defendant's facility, the decision to sign concerned the selection of health-care providers and, therefore, qualifies as a health-care decision under the UHCDA. *See Gross*, 83 F.Supp.3d at 695.

### 2. Lack of Capacity

As quoted above, "[a] surrogate may make a health-care decision for a patient who is an adult … if the patient has been determined by the primary physician to lack capacity and no

agent or guardian has been appointed or the agent or guardian is not reasonably available." Miss. Code Ann. § 41-41-211(1) (West).

In its reply brief, Defendant submits that the incapacity requirement was met with regard to Billy because Plaintiff's response brief includes numerous statements that James lacked capacity at the time he was admitted to the facility, and that "Dr. Brock's approval unequivocally corroborates Plaintiff's admissions regarding [James'] lack of capacity." Doc. #10 at 4–5. In this regard, Defendant contends that "both the Fifth Circuit and Mississippi Supreme Court have found that an admission from the resident or his representatives can establish incapacity at the time of admission for purposes of the statute." *Id.* at 3 (citing *JP Morgan Chase & Co. v. Conegie ex rel. Lee*, 492 F.3d 596, 599 (5th Cir. 2007), and *Covenant Health Rehab of Picayune, L.P. v. Brown*, 949 So.2d 732, 736–37 (Miss. 2007), *overruled on other grounds by Estate of Moulds*, 14 So.3d at 701–03).

In *Brown*, the Mississippi Supreme Court held that the UHCDA's incapacity determination requirement was met where the plaintiffs "submit[ted in their motion that the patient] was incapable of managing her affairs at the time she entered the hospital" and, although no declaration of a primary physician was available, an admitting physician at the relevant facility found that the patient lacked capacity. 949 So.2d at 736–37. Later, in *Conegie*, the Fifth Circuit found compliance with the statute where a party "admit[ted] that she ha[d] been 'diagnosed' with dementia psychosis and that she did not have '… the capacity to sign the Admission Agreement.'" 492 F.3d at 599. In reaching this conclusion, the Fifth Circuit relied on *Brown*, which it characterized as "holding that a similar concession satisfied the statute's required showing …." *Id.*

9

If *Brown* and *Conegie* stood as the only relevant case law, this Court would be inclined to agree with Defendant's position that admissions of incapacity alone may satisfy the statute's incapacity requirement. However, in recent years the Mississippi Supreme Court has strictly circumscribed the holding of *Brown*.

First, in *Adams Community Care Center, LLC v. Reed*, the Mississippi Supreme Court considered whether the statutorily-required incapacity had been shown based on: (1) an affidavit from a nursing home employee stating "that she met with [the patient] prior to … admission and found [the patient] to be 'confused and not able to understand our conversation adequately;" and (2) a written certification from a non-primary physician doctor that the patient "was 'confused' and required assistance or total dependence with activities of daily living." 37 So.3d 1155, 1159 (Miss. 2010). The *Reed* court held that the incapacity requirement had not been met because "[t]his Court must follow the plain and unequivocal language of the statute and require that, in order for one to act as a health-care surrogate, *there must first be a determination of a lack of capacity by a patient's primary physician* [and] there is no evidence that a primary physician found [the patient] to be incapacitated …." *Id*. (emphasis added).

Just last year, in *Hattiesburg Health & Rehab Center, LLC v. Brown*, the Mississippi Supreme Court addressed whether an admission of incapacity could satisfy the statutory requirement. 176 So.3d 17, 22–23 (Miss. 2015). In that case, a nursing home, citing to *Brown*, argued that the statutory requirement of incapacity had been met when the alleged surrogate represented in her response to the motion to compel arbitration that, at the time of admission, the decedent was incapacitated. *Id*. at 22. The *Hattiesburg Health* court acknowledged that, while *Brown* "did seem to sanction 'substantial compliance' with the surrogate statutes," the case did not control the outcome because: "[f]irst, [*Brown*] is distinguishable, because there was at least

10

some evidence in the record there that Brown's primary physician had made a capacity determination.[4] Here, there is no such evidence. Secondly and more importantly, *this Court has since returned to a strict interpretation of the surrogate statutes ….*" *Id.* at 23 (citing *Reed*, 37 So.3d at 1159) (emphasis and footnote added).

Based on the above authority, it is clear that the "substantial compliance" rule of *Brown* must be set aside and that courts must now employ "a strict interpretation of the surrogate statutes." *Hattiesburg Health*, 176 So.3d at 23. Under this approach, "in order for one to act as a health care surrogate, there must *first* be a determination of a lack of capacity by a patient's primary physician."[5] *Reed*, 37 So.3d at 1159 (emphasis added).

Here, there is no question that James' primary physician had not made an incapacity determination at the time Billy executed the Agreement. Thus, at the time Billy executed the Agreement, Billy lacked the authority to bind James. The motion to compel arbitration of the claims in this case then must be denied.[6]

## B. Unconscionability

Having found that the Agreement is not an enforceable agreement to arbitrate due to Billy's lack of authority, the Court declines to address whether the agreement is unconscionable.

---

[4] It is unclear what evidence from *Brown* the *Hattiesburg Health* court was referring to. In *Brown*, the Court specifically observed: "Neither party presents a declaration by Brown's primary physician stating that she was incapable of managing her affairs prior to the signing of the admission agreement, but Plaintiffs state in their motion that Brown's admitting physician at the hospital found that she did not have the mental capacity to manage her affairs." 949 So.2d at 736–37.

[5] In reaching this conclusion, the Court deems the conclusion in *Conegie* to be in clear conflict with *Reed* and *Hattiesburg Health* and therefore not binding on this Court. *See Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 747 (5th Cir. 1995) (Fifth Circuit determinations of state law binding on district courts "absent a subsequent state court decision … that rendered … prior [Fifth Circuit] decision clearly wrong").

[6] This Court has previously held that where an arbitration agreement relates to admission at a health-care facility, the failure to file the corresponding admissions agreement or other evidence "evinc[ing] a transaction involving interstate commerce" justifies denial of a motion to compel arbitration. *See Smith v. Liberty Health & Rehab of Indianola, LLC*, 4:14-cv-00161 (N.D Miss. Sep. 4, 2015) (Doc. #16 at 2). Defendant did not submit the relevant admissions agreement or other evidence showing that the Agreement relates to a transaction involving interstate commerce. This failure provides separate grounds for denial of the motion to compel.

*See Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 397 n.11 (2d Cir. 2015) ("Our resolution of the arbitrability issue in Plaintiffs–Appellees' favor makes it unnecessary for us to evaluate the merits of their unconscionability arguments in the first instance.").

V
**Conclusion**

For the reasons above, Defendant's motion to compel arbitration [4] is **DENIED.**

**SO ORDERED**, this 3rd day of February, 2016.

/s/ Debra M. Brown
**UNITED STATES DISTRICT JUDGE**